RAINES FELDMAN LLP
Sonia Y. Lee (Bar No. 191837)
  slee@raineslaw.com
Paul A. Kroeger (Bar No. 229074)
  pkroeger@raineslaw.com
9720 Wilshire Boulevard, 5th Floor
Beverly Hills, California 90212
Telephone:  (310) 440-4100
Facsimile:  (310) 691-1943

Attorneys for Defendants JASON ADELMAN
AND AFFINITY GLOBAL INSURANCE SERVICES

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re<br><br>C.M. MEIERS COMPANY, INC.,<br><br>Debtor.<br><br>---<br><br>BTJ INSURANCE SERVICES, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>HERBERT ROTHMAN, ERIC ROTHMAN, JASON ADELMAN, AFFINTIY GLOBAL INSURANCE SERVICES, DOES 1 through 10,<br><br>Defendants. | Case No.:  1:12-bk-10229-MT<br><br>Chapter 11<br><br>Adv. No. 1:12-ap-01118<br><br>**DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**<br><br>Date:    April 16, 2012<br>Time:    2:00 p.m.<br>Crtrm:   302 |

I, Jason Adelman, hereby declare as follows:

1. I am the Chief Executive Officer and President of defendant Affinity Global Insurance Services ("Affinity"), and am a named defendant in this action. I make this Declaration in support of the Opposition to the Application for Issuance of a Temporary Restraining Order and Order to Show Cause ("OSC") re Preliminary Injunction filed by plaintiff BTJ Insurance Services, Inc. Except where stated on information and belief, I know the following facts of my personal knowledge, and could and would testify competently to them.

2. I have reviewed the Complaint, declarations, exhibits and other papers submitted by Liberty with respect to its "Application for Temporary Restraining Order and Order to Show Cause re Preliminary Injunction" ("TRO"), and I am aware of the injunctive relief being requested. I have also reviewed the Trustee's Joinder to the Application for TRO and OSC re Preliminary Injunction, and ex parte application for an order to intervene in the action filed by Liberty. The allegations made by Liberty and the Trustee as to Affinity and me are false.

**Ownership of "Books of Business"**

3. I have worked in the insurance industry since 2000. Since then, in addition to Affinity, I have successfully started, owned, and operated HCF Insurance Agency, an unrelated company. HCF is a multi-million dollar insurance agency, offering insurance policies through the AM Best "A" rated and most coveted carriers in the industry. HCF has been awarded various accolades including, among other things, Best Places to Work and Fastest Growing Insurance Agencies in Southern California.

4. The most valuable asset of any insurance agency is its pool of producers – the salespeople who prospect, procure and maintain the business and relationships with the customers. The customers usually follow the producers when they change insurance agencies because the producers are the ones with the established relationships with the customers. Thus, in the insurance industry, as with most service-oriented industries, the

producers generally own the book of business generated from the customers or are given equity interest in the agency so that the producer can share in the overall profitability of the company.

5. Producers are generally paid a salary and/or a commission based upon some percentage of the revenues generated from their books of business. The compensation and/or remuneration paid to producers are fairly standard in the industry and well known. There is no magic formula. The producers with the larger books of business have greater bargaining power and are able to negotiate a higher percentage commissions than others with less sizable books of business

6. Most insurance agencies use a software program called AMS 360 (or similar software), an accounting and bookkeeping program for particular use in the insurance industry. In order to track the commission to be paid to a particular producer, each client account that is booked with the insurance agency is coded in AMS 360 to designate the producer who procured the account. However, the coding on the computer system or any other method of tracking the revenues is not indicative of who owns the account. By way of example, I personally have a large book of business for various health care facility clients that have obtained and maintained over the years for HCF. These accounts, however, are coded as "house accounts" in my agency's computer system. "House accounts" are those accounts on which no commissions are paid. Each of my accounts is coded as a "house account" because, as the owner of the business, I have elected to not earn any commissions on such accounts. Nevertheless, they are my accounts and my book of business. They do not belong to the company. It is my general experience, and the custom and practice in the industry, that most owners of insurance agencies code their own books of business "house accounts" because, as owners of the companies and while they own the companies, they elect not earn commissions on the accounts and instead earn a salary along with their equity interest. Furthermore, it creates more revenue to cover business expenses.

**CMM's Contemplated ABC**

7. In the fall of 2011, I became aware that Herb Rothman and Eric Rothman were potentially interested in selling an interest in their insurance agency, C.M. Meiers Company, Inc. ("CMM"). Eric Rothman is married to my sister, Heidi Rothman, and Herb Rothman is Eric Rothman's father. However, I do not regard myself as a member of the Rothman family. Other than this distant familial relationship, neither Affinity nor I have any relationship to CMM. We have done no business together and we have never shared offices, officers, owners, or employees. We were competitors.

8. Prior to this time, I had not even visited CMM's offices in more than a decade. In or about 2000, I became interested in learning the insurance business. For a period of approximately two months in 2000, I worked for Eric Rothman (without compensation of any kind), doing cold call marketing for him. At the conclusion of that time, Jeff Kleid, who was then president of CMM, terminated my engagement; I had not set foot in CMM's offices again until the fall of 2011. Over the course of the following year, I obtained my property and casualty license and began operating HCF.

9. At the time I learned of the Rothmans' interest in selling a share of CMM, CMM had a reputation as one of the largest and most successful single-held insurance agencies in California, employing nearly a hundred employees and/or 1099 Independent Contractors who served as Producers for CMM with minimal turnover (most employees have had a lengthy tenure there), and without any violations with the Department of Insurance. For these reasons, I began discussions with Herb and Eric Rothman about the possibility of my buying an interest in CMM and continuing to operate it with them.

10. During the course of our discussions, however, I learned that one of CMM's former producers, Gensar Saleigh, had initiated an arbitration proceeding against CMM – which proceeding was then pending, and that CMM's former president, Kleid, had also threatened litigation against CMM. Due to the possibility of significant exposure for any

4

DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TRO

1  incoming investor as a result of these real and threatened actions, I decided not to pursue a
2  purchase of an interest in CMM.

3      11.    In October 2011, I am informed that CMM made an announcement to its
4  employees, producers, clients and carriers that it was planning to file for Chapter 11 due to
5  the pending and threatened legal actions by Saleigh and Kleid.  I am further informed that
6  Herb and Eric Rothman changed their mind about filing for bankruptcy for fear that the
7  filing of bankruptcy would trigger a mass exodus of employees and clients.  Instead, in or
8  about November 2011, they came to me and advised me that they were going to do an
9  assignment for the benefit of creditors ("ABC") by selling all of the assets of CMM to
10 Equitable Solutions, Inc. ("Equitable"), the designated assignee.

11     12.    I understood that an ABC was an alternative favored by creditors and the
12 courts over a bankruptcy proceeding as a means of preserving the company as a going
13 concern while avoiding the stigma and potential adverse impact of a formal bankruptcy
14 proceeding.  Further, I understood that, as is the usual case with ABCs, the assignment
15 would be of the assets only and would exclude any liabilities of CMM.  Thus, once CMM
16 entered into an agreement with Equitable, I contacted Equitable on behalf of Affinity to
17 express Affinity's interest in bidding for CMM's assets.  Thereafter, with Equitable's
18 knowledge, agreement and cooperation, Affinity began the process of due diligence to
19 determine the value of the assets and any other material information that would impact such
20 a purchase.

21     13.    Liberty contends that during Affinity's due diligence, Affinity discovered that
22 CMM's client trust account was short by approximately $1,000,000.  This allegation is not
23 accurate.  At the time of the contemplated ABC, I had heard statements allegedly made by
24 Saleigh that CMM's client trust account was out of significant sums.  Understandably, such
25 an allegation gave me grave concerns.  Thus, as part of Affinity's due diligence, we
26 conducted a financial review of CMM.   Based upon a preliminary and limited review, we
27 initially concluded that there was a potential shortfall of as much as $1.2 million in the trust
28

account. However, that figure continued to be adjusted downward over the course of our continued due diligence. For example, we reduced the figure when we learned that (i) Travelers Insurance (to whom we had ascribed an approximate $134,000 shortfall), had conducted its own audit and concluded that there was no shortfall, and (ii) Fireman's Fund had reviewed the trust account and notified CMM that, rather than what appeared to be an initial shortfall of $240,000, it actually owed CMM funds based on its findings. Based upon these and other factors, we ultimately estimated a potential shortfall of approximately $248,000.

14. We also determined that it was not possible to conclude if the trust account was actually short by any monies because, among other things, certain policies booked by CMM were paid directly by the client to the carriers. By way of example, one way to determine how much monies should be in the client trust account is by reviewing the policies booked and the premiums due under the policies based upon amounts invoiced to the clients. Such premiums would generally be paid by the clients to CMM and CMM would forward to the carriers when due. However, in certain instances, the clients paid the premiums directly to the carriers. Thus, it may appear that such premiums are "missing" from the trust account when, in actuality, they were never a part of the account in the first instance. Accordingly, until a final accounting is provided by the carriers, which may take months, it is not possible to tell whether any monies were missing from the trust account.

15. Based upon the information that was available to us, we felt comfortable that Saleigh's allegations were vastly overstated – if not completely fabricated. Indeed, in addition to the review of the books and records, there were none of the usual indicators of the company being "out of trust," which include, by way of example, carrier notices of cancellations for nonpayment as well as the aging reports being relatively nonexistent. Thus, Affinity decided it would proceed with the attempt to purchase the assets. To protect the creditors and clients, however, to the extent that a final audit showed any underfunding of

the trust, Affinity agreed to replenish those amounts if it was the successful bidder for the assets and calculated such funding as part of the proposed purchase price.

16. To that end, following the due diligence and pursuant to a valuation of the company conducted by CMM and approved by Equitable, Affinity made a fair offer for the assets of CMM which included an upfront cash payment and an agreement to make up any shortfall in the client trust, if necessary – a total consideration of approximately $1.1 million. Saleigh also came in with a similar bid to purchase the assets of CMM for a proposed purchase price nearly identical to Affinity's. I am informed and believe that Equitable's counsel asked Saleigh to provide proof of his intent and ability to overbid, giving him a deadline of January 3, 2012 to do so. In response, Saleigh did not offer any proof of his intent or ability to overbid; instead, he began a campaign of threats against Equitable, notifying it that it would be sued if the ABC went forward. To further intimidate the assignee, Saleigh filed an action against CMM and Affinity in the Superior Court of the State of California on or about January 6, 2012. Notably, however, Saleigh has yet to serve the complaint on any party or take any action to prosecute the case.

17. Meanwhile, on or about December 22, 2011, Kleid filed an action in the Superior Court of the State of California against CMM and Affinity. Although Kleid had the opportunity to purchase the assets of CMM through the ABC, similar to any other bidder, including Affinity and Saleigh, Kleid opted not to make any offer. Instead, on or about December 29, 2011, Kleid applied for and obtained a Temporary Protective Order ("TPO") preventing CMM from transferring any of its assets in an effort to halt the ABC. However, in issuing the order, the Superior Court noted that he was issuing the TPO because, under applicable law, a TPO would not stop an ABC and thus there was no harm to CMM in its issuance. Accordingly, Kleid's counsel then sent a letter to Equitable and to counsel for CMM and Affinity threatening to add Equitable as a defendant to the action if the parties continued with and completed the ABC.

18. Faced with the cost and expense of defending itself against claims by Kleid and Saleigh – even though the claims would be entirely without merit – on January 9, 2012, Equitable's counsel advised CMM and Affinity that Equitable was unwilling to take the assignment and move forward with the ABC due to the obvious potential for litigation against it. Having no other choice, on the same date, CMM filed for Chapter 11 protection.

**The Bankruptcy Proceeding**

19. Liberty contends in this action that Affinity failed to make any other offer than its initial offer as a stalking horse bidder because Affinity had already "stolen" CMM's confidential information and "raided" its employees and clients. These allegations are categorically false.

20. As an initial matter, as the Court may recall, prior to the auction of the assets of CMM, the Trustee advised that he intended to convert the proceeding from that of Chapter 11 reorganization to Chapter 7 liquidation. One of the main grounds given for the conversion was that the company was out of money and in dire straits and no one wanted to bid on the assets. Shortly prior to the auction, there were no bidders for the company's assets. Affinity in good faith agreed to step in as the stalking horse bidder so that the company could continue to operate and its creditors could be paid. As this Court noted, but for Affinity, the company and its creditors would have been irreparably harmed.

21. Based upon the due diligence conducted by Affinity, it made an offer to purchase the assets of CMM for $750,000 up front cash payment and to make up any shortfall in the client trust account, without any limit, which is substantially similar to the offers made by Affinity and Saleigh during the ABC. Although it was provided time to do so, I am informed that Liberty opted *not* to conduct any due diligence regarding the assets and business of CMM including, among other things, reviewing and analyzing employee, producer and independent contractors agreements, conducting an accounting of the trust accounts, and reviewing the accounts payable and accounts receivable of the company. Accordingly, it grossly overbid for the assets in the auction, offering $1.35 million in cash

8

DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TRO

payment plus curing of the trust deficiency, if any.  Capitol Financial Services, owned by Saleigh, even bowed out of the auction recognizing that CMM's assets were not worth the bids being made by Liberty.  At bottom, we had no intention of overbidding at the auction because the offers being made by Liberty at the auction were unsupportable and made no financial sense – nothing more; nothing less.

22.    Liberty, of course, quickly realized its error and – after its bid had already been accepted and the auction closed – renegotiated the terms of the agreement with the Trustee. Under the terms of the newly-negotiated agreement, Liberty was required to pay only $850,000 in cash up front.  The final purchase price was to be 45% of the annual revenues of CMM's owned accounts, to be determined based upon an accounting to be conducted.  The initial $850,000 paid would be credited against such revenues.  In other words, even according to Leach, if the annual revenues of CMM's owned accounts did not exceed $1,888,888, Liberty would pay only $850,000 for the assets, in addition to making up any shortfall in the client trust account.  These terms were *not* offered at the auction in which Affinity participated and Affinity did not have an opportunity to bid on the same terms – which was substantially the same as Affinity's initial stalking horse bid and substantially less than Saleigh's last bid at the auction.  At the time of the sale of CMM's assets, even accounting for the "house accounts" alleged re-coded to Herb Rothman's accounts, I am informed and believe that the revenues for the CMM owned accounts were approximately $2 million.  Thus, in effect, Liberty purchased CMM for substantially less than the winning bid.

23.    Neither Affinity nor I "took" any confidential information allegedly belonging to CMM.  During the contemplated ABC, Affinity was provided with certain financial and business information relating to CMM in order to conduct our due diligence. When Equitable backed out of the ABC and CMM filed for bankruptcy, I caused all such documents to be gathered and I provided them to Affinity's bankruptcy counsel, Alston & Bird.  We offered all such documents to the Trustee in order to facilitate his transition as the Court-appointed Trustee for the debtor.  Any copies of such documents which we had at Affinity were

9

DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TRO

thereafter destroyed. Affinity does not have any "confidential" information belonging to CMM and have never used any such information in the conduct of its business.

24. Liberty makes certain unsubstantiated and conclusory allegations about the impropriety of Affinity's conduct during the ABC and the bankruptcy proceeding. ***Affinity has done nothing wrong***. The only thing Affinity has ever done was to try to preserve the company as a going concern so that the employees, clients, and creditors would not be harmed. In fact, this Court made the following findings and observations about Affinity:

> All sorts of allegations were made in support of the trustee motion and echoes of these allegations continue. ***Nothing concrete has been proffered other than a family connection by some of the officers***. While the statutory definition of an insider may not be met, the court has still scrutinized the exhibits, testimony and allegations against Affinity and taken all allegations seriously. Based on the record reviewed, at best Affinity may have known more about debtor's business and availability for sale before others because of a family relationship. Any unlevel playing field has now been leveled by the appointment of a trustee and the opportunity for other bidders to review the books and records. There are competitors in a highly competitive business taking sides for or against Affinity, and the lengthy hearing allowing anyone to speak about what they observed before Trustee was appointed has given employees, former CMM producers and others an opportunity to prove any improprieties by Affinity. ***No evidence of any lack of good faith has been shown***. (Emphasis added.)

Attached hereto as Exhibit A is a true and correct copy of the Court's tentative ruling issued on February 3, 2012.

25. The Court also found that the work that Affinity had done during the proposed ABC and in the bankruptcy action prior to the appointment of the Trustee was of great help and assistance to the Debtor estate. Specifically, the Court found that:

> Significant due diligence has been done over the previous weeks. Having the Asset Purchase Agreement already drafted and significant details worked out has made it possible to move quickly in this situation. In conjunction with the earlier attempt at an ABC, Affinity spent a lot of time reviewing debtor books and records and played a significant role in the discovery of the "out of trust" issue. Because this issue is of significance to any buyer, a breakup fee bears even more of a rational relationship to the initial bidder's role. ***Any potential buyer has benefited from Affinity's initial work***. (Emphasis added.)

**CMM's Producers and Their Business**

26. Liberty's contention that Affinity has "raided" CMM's clients using CMM's "confidential information" is also an absolute lie. In approving a quick sale of CMM's

10

DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TRO

assets, the Court made the following finding:

> Based on the testimony considered in conjunction with the evidentiary hearing on January 20th, the court finds Trustee has exercised sound business judgment in seeking such a quick sale of Debtor's assets. ***The business "Producers" have been leaving in droves over the last few months***, clients are getting nervous, and the debtor's value is greatly reduced, if not lost, if it is not sold as a going concern. The cash flow situation is so severe that the business cannot continue if it is not sold immediately. If the business is not sold by February 6, the case will need to be converted to Chapter 7 and even the main secured creditor may be undersecured. (Emphasis added.)

27. In fact, well before the Court approved the sale of CMM's assets, a number of producers and their clients left CMM. In late December 2011, CMM's staff heard that Saleigh was going to bid for CMM's assets through the ABC and they came to me for assurance. When I told them that Affinity could not guarantee that Affinity would be the successful bidder, there was chaos to say the least. Liberty alleges that I somehow "drove out" the producers by giving them "take-it-or-leave-it" contracts. This allegation is categorically untrue. While contemplating the ABC, I did everything I could to negotiate a favorable contract with the producers to induce them to stay. In fact, I would have no incentive to "drive out" the producers since, if they left with their business, it would reduce any revenues I would hope to receive should I be the successful purchaser in the ABC. As Diane Ewing testified before this Court at the hearing held in January 2012, producers began looking for a new agency to join as early as October when CMM made its premature announcement of a bankruptcy filing, well before anything I did in connection with the contemplated ABC.

28. These producers and clients left because they were concerned about the company going bankrupt or because of the possibility of Saleigh acquiring the business. Their departure had nothing to do with any contract that I presented. To the contrary, as presented to this Court previously, many of these producers submitted letters stating that they would stay with the company only if Affinity was the successful purchaser of CMM's assets.

29. CMM did not lose any producers or clients until late December when Saleigh came into the picture with his bid in the ABC and rumors of the client trust being "out of

trust." At that point, and only at that point, did the number of producers at CMM drop from 17 to approximately 6 and three-quarters of the entertainment clients took their accounts away from CMM to competing agencies, GNW Evergreen, Momentous, and Robertson Taylor where these former CMM producers went. ***None of these Producers have ever been or are employed by Affinity. None of their clients' business has ever been or is with Affinity.***

30. Once CMM announced that it had filed for Chapter 11 bankruptcy, and because of the filing of bankruptcy, CMM lost its President (Dianne Ewing), Operations Manager (Jennifer Riggio), its top 5 producers and a support staff of 20 more. One of the most profitable branches, the Torrance office and its team managed by Heather Himmelwright, resigned after hearing of the Chapter 11 filing this January, thus forcing the closure of Torrance offices. In total, CMM lost about a third of its remaining staff and 40 percent of its remaining revenues. ***None of these producers have ever been or are employed by Affinity. None of their clients' business has ever been or is with Affinity.***

31. In total, from December 2011 to January 2012, for reasons unrelated to me, a total of 15 producers and account executives, representing not less than $4.1 million in annual gross sales, left CMM. ***None of these producers or account executives has ever been or is employed by Affinity. None of their clients' business has ever been or is with Affinity.*** I am informed and believe that after the sale of CMM's assets to Liberty, many more producers and clients have also left the company and have taken their clients with them to agencies. Other than the employees and producers specifically identified here in my declaration, none of those producers have joined Affinity.

32. Liberty contends that Affinity "systematically" hired and contracted with Herb and Eric Rothman and other CMM employees to "misappropriate" CMM's trade secrets and to solicit "Liberty's clients" using such allegedly misappropriated information. In support, Liberty contends that it received 21 broker of record ("BOR") letters from various customers of Herb and Eric Rothman stating that they were changing their broker of record to Affinity.

(Leach Decl., ¶ 16, Ex. D.)  Liberty further contends that it received "well over 100 other BOR letters from former CMM customers moving their business away from [Liberty]." (Leach Decl., ¶ 20.)  Liberty is attempting to deliberately deceive this Court.

33.     A BOR permits the broker selected by the client to service the policy with the carrier and to otherwise act of the client.  If the BOR is executed during the term of an existing policy, the new broker would service the policy and take on all of the agent's liabilities for the policy *but* do not receive any commissions or fees for that existing policy.  In other words, the insurance agency that originally bound the policy collects all of the commissions and fees for the policy without any liabilities.  The new broker would not receive any commissions or fees unless and until the client renews the policy through the new broker of record.  As noted in Exhibit D to Leach's declaration, the BOR specifically identifies the new broker appointed by the client.  The actual BOR letters are not generally provided to the prior agent, such as Liberty, and thus the prior agent, in normal circumstances, would not know the identity of the new broker of record.  CIBA is the only exception to the rule, to my knowledge.

34.     Liberty contends that it received "over 100 BOR letters" from various former CMM clients but fails to identify who those clients are or to attach the actual BOR letters identifying the broker appointed by the clients.  Liberty instead deliberately gives the misimpression that, because the 21 BOR letters sent to CIBA were for Eric and Herb Rothman's clients and appointed Affinity as the broker, these unspecified and unidentified "over 100 BOR letters" were also for Herb and Eric Rothman's clients and they also appointed Affinity as the broker.  The truth is that Liberty has no evidence that any of the "100 BOR letters" appointed Affinity as the broker on behalf of Herb and Eric Rothman.  It is simply speculating – *without any justification or support* – that the business went to Affinity.  By implying that these clients transferred their business to Affinity, *when they have no evidence whatsoever or, worse yet, when they have evidence conclusively demonstrating otherwise*, Liberty is intentionally lying to this court and its conduct is

1  reprehensible.

2      35.    As set forth below, the only clients from whom Herb and Eric Rothman procured BOR letters – which were done at the clients' request without any solicitation by the Rothmans or Affinity – are the clients specifically identified by name in Liberty's TRO papers, consisting of approximately eleven or twelve customers. Herb and Eric Rothman obtained approximately 25 BOR letters, each of which was obtained fairly and properly.

    36.    That Liberty is deliberately and unfairly targeting Affinity for improper and illegitimate purpose is clearly demonstrated by the fact that, even though Liberty knows that other producers have left and taken clients in the tune of millions of dollars with them to other competing agencies, Liberty has not filed any action against those producers or agencies.

    37.    With regard to the hiring of any former CMM employees or any business they have obtained, the true facts are as follows:

        a.    Affinity has retained the services of Herb Rothman and Eric Rothman as independent consultants for Affinity. Affinity did so *after* they were fired by the Trustee. They were notified on February 4, 2012 that they were being fired by CMM, effective as of February 6, 2012. Affinity did not retain them until February 13, 2012. In addition to Eric and Herb Rothman, Affinity has hired only four former employees of CMM: Charlene Hill, Carol Dooley, Ilene Wise, and Luwana Malone. All of these employees were hired by Affinity *after* they had been *fired* by the Trustee and after Liberty chose not to hire them. Charlene Hill was fired by the Trustee on February 16, 2012. She was not hired by Affinity until February 27, 2012. Carol Dooley was fired by the Trustee on February 17, 2012. She was hired by Affinity on February 27, 2012. Ilene Wise was fired by the Trustee on February 16, 2012. She was hired by Affinity on March 8, 2012. None of these individuals did any work for Affinity or had any affiliation with Affinity before they were hired. None of them even received business cards from Affinity until March 2012.

14

b.  Luwana Malone was also hired by Affinity on February 27, 2012 after she was fired by the Trustee on February 16, 2012.  After she started working for Affinity, however, Liberty solicited Ms. Malone, Eric Rothman, Herb Rothman, and certain HCF employees – who had *never* worked at CMM and/or Liberty – for employment at Liberty. It was successful in luring away Ms. Malone on behalf of Liberty, and she has actively been competing against Affinity and HCF.  Unbelievably, after all of the claims and allegations it made against Herb and Eric Rothman, *e.g.*, that they were the cause of CMM trust accounts being "out of trust," and their being under investigation by the Department of Insurance, only two weeks ago, Liberty made an offer of employment to Herb and Eric Rothman, which offer they rejected.

c.  Before any of these individuals were retained or hired by Affinity, we took every precaution to make sure that there was no question of any impropriety.  To that end, Affinity engaged an employment/labor attorney to guide and advise them.  Each of these individuals was given express directions on what they could or could not do in working for Affinity.  In particular, Affinity required each person to confirm that he or she did not possess any property of CMM or Liberty, that he or she did not take any confidential or proprietary information belonging to CMM or Liberty, and that he or she would not use any confidential or proprietary information belonging to CMM or Liberty at any time while employed with Affinity.  Each individual was required to go through and sign a checklist confirming such information.  And, consistent with their agreement and confirmation, to the best of my knowledge, none of these individuals has used or disclosed any such information in the performance of their duties and responsibilities at Affinity.  To my knowledge, Affinity does not have nor has ever used any alleged confidential or trade secret information belonging to CMM or Liberty.

d.  In point of fact, no such "confidential information" is needed.  As evidenced by the accompanying declarations of Herb Rothman, Eric Rothman, James Jackson, Sheldon Goldman, and David Osterman, each of the customers who actually signed

a BOR letter appointing Affinity as the new broker of record sought out Herb and Eric Rothman. Neither Herb nor Eric solicited the customers or used any "confidential information" to do so.

e. As an initial matter, although there were approximately 25 BOR letters executed for various policies, there are only twelve or so actual customers at issue. By way of example, Mary R. Gabriel, MGRB Property Holding and Doc Johnson are all related entities and persons. *See*, James Jackson Declaration. Alpha Business Center, Centerport Industrial, and Bhind, LLC are likewise related entities controlled by one individual. *See* David Osterman Declaration. Similarly, Scott Management and Jacobson Brothers are controlled by one individual. *See* Sheldon Goldman Declaration. The absurdity of Liberty's "misappropriation" allegation is highlighted by the fact that Liberty contends Herb, Eric, and Affinity used "confidential information" belonging to CMM to "solicit" and "raid" Wen-Er Farms. As made clear by Herb and Eric's declarations, ***Wen-Er Farms is owned by Herb and Eric Rothman***.

f. Not only is Liberty wrong that the defendants did anything unlawful in obtaining the BORs from these clients, Liberty is also absolutely wrong as to the amount of revenues generated from these customers. Liberty contends that they will "lose" at least $300,000 in commission revenues in the first year from these customers allegedly lost to Affinity and that at least $250,000 of such commissions will be paid to the defendants in the next year. They also claim that the total value of these "assets" is $1.65 million to $1.75 million based on a five-year retention period. These amounts are sheer fantasy. Assuming that Liberty can even establish that the BOR letters in favor of Affinity were wrongfully obtained – which it cannot – the total amount of ***gross*** profits received by Affinity from ***all*** of the clients who chose to follow their friends and long-term colleagues and place business with Affinity are approximately $70,000. The net profits to Affinity from such business will be less than ***$30,000***. Moreover, it is nothing but rampant speculation that Liberty would have been able to retain any of these clients for any period of time – let alone five (5) years –

without the producers with whom these clients have established relationships and a proven track record.

38. Based upon nothing more than "buyer's remorse," Liberty has embarked upon a smear campaign to irreparably destroy the reputation, goodwill, and business of Affinity and me, personally. Liberty has sent out a highly defaming and damaging letter to nearly seventy-five (75) carriers and MGA's doing non-exclusive business with CMM and customers who had done business with CMM falsely accusing Herb and Eric Rothman of engaging in theft and breaches of fiduciary duty and Affinity of conspiring in the same. Attached hereto as Exhibit B is a true and correct copy of the blanket letter sent by Liberty. It is spreading lies to everyone in the industry that Affinity is also "out of trust" and that the clients' monies will not be safe if they do business with Affinity. At least one Liberty executive told such lies directly in front of me to a carrier executive at a one of the biggest and well-attended insurance industry event. Several carriers have advised me that, because of statements, allegations and innuendos made by Liberty, they cannot and will not conduct business with Affinity. Liberty's actions and conduct are destroying my name and agency.

39. As a result of Liberty's indefensible conduct, almost every carrier has refused to do business with Affinity and many are now refusing to do business with HCF. Without such carrier relationships, it is impossible for an agency to conduct its business in placing policies for their clients. Affinity has sent a Cease and Desist letter to Liberty in an effort to halt their wrongful conduct. Attached hereto as Exhibit C and D are two cease and desist letters I caused Affinity's attorney to send to Liberty. But this has not deterred Liberty whatsoever. Liberty must be stopped from engaging in such unfair and unlawful competitive conduct. If it is permitted to continue in what can only be described as extortionate tactics, Affinity may have to shut its doors and all of its employees will lose their jobs.

DECLARATION OF JASON ADELMAN IN SUPPORT OF OPPOSITION TO APPLICATION FOR TRO

1  I declare under penalty of perjury under the laws of the United States of America that
2  the foregoing is true and correct.
3  Executed at Beverly Hills, California on April 14, 2012.

_____
Jason Adelman